NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

STEVEN H., TATUM S., *Appellants*,

*v.*

DEPARTMENT OF CHILD SAFETY, M.H., *Appellees*.

No. 1 CA-JV 21-0193
FILED 12-2-2021

Appeal from the Superior Court in Maricopa County
No. JD37469, JS20502
The Honorable Todd F. Lang, Judge

**AFFIRMED**

COUNSEL

Czop Law Firm PLLC, Higley
By Steven Czop
*Counsel for Appellant Steven H.*

Maricopa County Public Advocate, Mesa
By Suzanne W. Sanchez
*Counsel for Appellant Tatum S.*

Arizona Attorney General's Office, Mesa
By Amanda Adams
*Counsel for Appellee Department of Child Safety*

---

**MEMORANDUM DECISION**

Judge Jennifer M. Perkins delivered the decision of the Court, in which Presiding Judge Cynthia J. Bailey and Judge Maria Elena Cruz joined.

---

**P E R K I N S**, Judge:

¶1 Steven H. ("Father") and Tatum S. ("Mother") (collectively "Parents") appeal the juvenile court's order terminating their parental rights to M.H., born October 2016. For the following reasons, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

¶2 Parents are M.H.'s biological parents. Parents' other child, S.H., was about three months old when she died after a "near drowning" incident in May 2019. As a result, the Department of Child Safety ("DCS") took temporary custody of M.H. and initiated dependency proceedings. DCS alleged Parents either abused S.H. or failed to protect her from abuse, causing her death. Parents contested the allegations at the preliminary protective hearing, but the court kept M.H. in DCS's custody, limited Mother's visitation rights, and prevented Father from seeing M.H.

¶3 DCS petitioned to terminate Parents' rights to M.H on three grounds: (1) nine-month time in care; (2) Parents substantially neglected or willfully refused to remedy the circumstances that caused M.H. to be in DCS's care; and (3) Parents willfully abused S.H. or failed to protect S.H. from willful abuse. The juvenile court consolidated the dependency and termination matters and held an eleven-day joint dependency and termination hearing, which concluded with written closing arguments in March 2021.

¶4 At the hearing, the testimony focused on the circumstances surrounding S.H.'s death, and the juvenile court made detailed factual findings about the event. Father testified that on the morning of S.H.'s near drowning, Father was in the backyard alone with both children. He said he was holding S.H. when M.H. grabbed or pushed the back of his legs, causing him to trip and fall forward into the pool. Father said S.H. landed in the pool first and he landed on top of her. Father claimed he then reached down underwater and grabbed S.H. by her legs, held her above his head, and threw her "a few feet" out of the pool and onto the concrete deck.

Father said he did not see her land and she was underwater for only a matter of seconds.

¶5            Father testified that he exited the pool and began administering chest compressions and small breaths after noticing S.H. struggled to breathe. Father claimed that after "three or four" breaths, S.H. coughed up a "bit" of water before taking her to the shower to warm her "cool" and "pale" skin. Father next called Mother, who raced home, and then Parents called 9-1-1. Paramedics arrived within three minutes and began treating S.H. for drowning while transporting her to the hospital.

¶6            S.H.'s doctors became suspicious because her injuries were inconsistent with Father's story and requested the hospital's child protection team examine S.H. Parents did not give the hospital's child protection team a plausible explanation for S.H.'s injuries. Parents suggested S.H. could have sustained some of her injuries one month earlier, when M.H. reportedly flipped S.H. off her pillow and onto the mattress. S.H. died two days after arriving at the hospital.

¶7            DCS and Parents presented competing medical experts. DCS's experts testified about the cause and extent of S.H.'s injuries, stating the most likely cause was nonaccidental trauma. Parents' experts testified S.H.'s condition did not result from abuse, but rather the catastrophic effects of a near-drowning incident on a child who either had unusually fragile bones or a similar undiagnosed disorder.

¶8            Dr. Raul Galvez, a pediatric intensive care physician, testified that S.H.'s chest x-ray revealed a healing fracture on one of her ribs. Galvez explained that a CT scan of S.H.'s head revealed additional injuries: a subdural hematoma, a skull fracture, and brain swelling. The Chief Medical Officer for the hospital, Dr. Jennifer Matchey, testified that the fractures and subdural hematoma were an acceleration/deceleration injury, an injury often associated with shaken baby syndrome.

¶9            Dr. Aaron Greeley, a radiologist, testified that the healing rib fracture appeared to be a re-fracture of a prior injury and that S.H. had four rib fractures that had not begun healing. Greeley also testified the healing fracture occurred two to three weeks earlier and the other fractures occurred less than two weeks before her death, suggesting a series of injuries during S.H.'s short life. Greeley also found metaphyseal fractures or lesions on S.H.'s tibia and femurs, which showed signs of healing. She testified that these lesions are most seen in nonaccidental trauma incidents. A pediatric nurse practitioner, who served on the child protection team,

testified that the healing fractures could not have been caused by Parents' version of events.

**¶10** The juvenile court found the evidence established that some of S.H.'s injuries occurred before her near drowning. The court found Parents' experts unpersuasive and noted they "appear[ed] to be more interested in an intellectual debate" on abusive head trauma than evaluating the circumstances of S.H.'s death.

**¶11** Based on the timing of the rib injuries and the testimony of the medical experts, the juvenile court found it "quite unlikely that all of [S.H.'s] rib injuries were caused by rescue efforts (whether CPR, back slapping, or other efforts)" and that one or both of her parents caused S.H.'s physical injuries. The court then terminated Parents' rights on two grounds: abuse and neglect under A.R.S. § 8-533(B)(2), and nine months' time in care under § 8-533(B)(8)(a). The court also found termination was in M.H.'s best interests because termination would remove the possibility of future abuse and a relative adoption was available with his current placement, at which he was currently "thriving."

**¶12** Parents timely appealed from the dependency and termination order. We have jurisdiction under A.R.S. §§ 8-235(A) and 12-120.21(A)(1).

## DISCUSSION

**¶13** "Before a State may sever completely and irrevocably the rights of parents in their natural child, due process requires that the State support its allegations by at least clear and convincing evidence." *Santosky v. Kramer*, 455 U.S. 745, 747–48 (1982). "[S]uch a standard adequately conveys to the factfinder the level of subjective certainty about his factual conclusions necessary to satisfy due process." *Id.* at 769. Thus, to terminate the parent-child relationship, the juvenile court must find parental unfitness based on at least one statutory ground by clear and convincing evidence. *Kent K. v. Bobby M.*, 210 Ariz. 279, 284, ¶ 22 (2005).

**¶14** We review the termination of parental rights for an abuse of discretion. *Titus S. v. Dep't of Child Safety*, 244 Ariz. 365, 369, ¶ 15 (App. 2018). This court will uphold the juvenile court's findings of fact "if supported by adequate evidence in the record." *Christy C. v. Ariz. Dep't of Econ. Sec.*, 214 Ariz. 445, 452, ¶ 19 (App. 2007) (cleaned up). As the trier of fact, the juvenile court "is in the best position to weigh the evidence, observe the parties, judge the credibility of witnesses, and resolve disputed

facts." *Oscar F. v. Dep't of Child Safety*, 235 Ariz. 266, 269, ¶ 13 (App. 2014) (cleaned up). Accordingly, we will not reweigh the evidence. *Id.*

## I.        Statutory Grounds

**¶15**        The juvenile court may terminate parental rights when a parent "has neglected or wilfully abused a child," including "situations in which the parent knew or reasonably should have known that [another] person was abusing or neglecting a child." A.R.S. § 8-533(B)(2). Neglect includes a parent's "inability or unwillingness . . . to provide [a] child with supervision . . . or medical care if that inability or unwillingness causes unreasonable risk of harm to the child's health or welfare." A.R.S. § 8-201(25)(a). Abuse includes "the infliction or allowing of physical injury. . . caused by the acts or omissions of an individual who has the care, custody and control of a child." A.R.S. § 8-201(2).

**¶16**        The juvenile court need not definitively decide which of two parents physically abused a child when the evidence shows that "each parent either abused [the child], knew that [the child] had been abused, or reasonably should have known that the other parent abused [the child]." *See Sandra R. v. Dep't of Child Safety*, 248 Ariz. 224, 231, ¶ 29 (2020). The court may further "extrapolate" a parent's unfitness and terminate his or her parental rights to a non-abused child if there is "a risk of harm" to the non-abused child. *Id.* at 228–30, ¶¶ 17, 24–27. In evaluating the risk of harm, we consider the nature of the abused child's injuries and the age and vulnerability of the child at issue. *See id.* at 231, ¶ 31.

**¶17**        The juvenile court found S.H. suffered from nonaccidental trauma and Mother, Father, or both intentionally abused S.H. or knew or should have known she was being abused. The court heard testimony that S.H. suffered multiple injuries at various times, that Father's story did not account for her injuries, that the pattern of injuries was specific to abusive head trauma, and that S.H. did not have a bone abnormality that would account for her fractures. This evidence supports the court's conclusion that S.H. suffered abuse.

**¶18**        The juvenile court noted that Mother and Father remained committed to one another, and even got engaged after S.H.'s death. And both testified they thought the other was a good parent. The court found it would harm M.H. to live with Parents because the non-abusing parent either did not recognize the abuse or is protecting the abuser. The court thus concluded that S.H.'s death, along with Parents' unwillingness to protect

M.H. from future abuse, established a severe risk of abuse to M.H, a four-year-old vulnerable child.

**¶19** Father argues on appeal that because the nurse practitioner was not a medical doctor, the juvenile court committed fundamental error by relying on his testimony. If an expert witness meets the liberal standards for minimum qualifications, his credentials or level of expertise go to credibility and weight rather than admissibility. *State v. Delgado*, 232 Ariz. 182, 186, ¶ 12 (App. 2013). Here, the witness had thirty-four years' experience in child abuse pediatrics and a master's degree in child maltreatment, completed more than 10,000 clinical evaluations, and served as a professor at a medical school teaching child abuse pediatrics. In short, the witness met the minimum qualifications standard, and we will not second-guess the juvenile court's reliance on the testimony as credible.

**¶20** Parents also argue that reasonable evidence did not support the juvenile court's abuse finding because Parents' experts provided differing theories of the sources of S.H.'s injuries. But the court found Parents' experts unpersuasive. Parents ask us to reweigh the evidence and redetermine the credibility of witnesses, something we will not do. *See Oscar F.*, 235 Ariz. at 269, ¶ 13.

**¶21** The record supports the juvenile court's finding that Parents abused S.H. and M.H. remained at risk of harm if left in their care. The court did not abuse its discretion by terminating Father and Mother's parental rights based on the abuse ground. *See* A.R.S. § 8-533(B)(2). Given this determination, we need not address the other statutory ground. *See Michael J. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 246, 251, ¶ 27 (2000).

## II. Best Interests

**¶22** Once the juvenile court finds that clear and convincing evidence establishes a statutory ground for termination of parental rights, it must determine whether a preponderance of the evidence establishes that termination is in the child's best interests. *Alma S. v. Dep't of Child Safety*, 245 Ariz. 146, 149–50, ¶ 8 (2018). "The child's interest in stability and security must be the court's primary concern." *Id.* at 150, ¶ 12 (cleaned up). Mother contends it was not in M.H.'s best interests to lose his younger sister and then permanently lose both of his parents. Mother points to evidence that M.H.'s first foster placement may have abused him as proof he would be safer with Parents. The court found M.H. is "thriving" with his current placement, the mother of Father's sister-in-law, who intends to adopt him. The court properly considered the immediate availability of an adoptive

placement in its analysis. *Audra T v. Ariz. Dep't of Econ. Sec.*, 194 Ariz. 376, 377, ¶ 5 (App. 1998).

**¶23** The juvenile court also found it would harm M.H. to be placed with Parents because Mother and/or Father engaged in child abuse resulting in S.H.'s death, yet both parents testified they do not consider the other to be a safety threat. Mother again asks us to reweigh the evidence and step into the role of fact finder, something we will not do. *See Oscar F.*, 235 Ariz. at 269, ¶ 13. The record supports the court's best interests conclusion.

**CONCLUSION**

**¶24** We affirm.



AMY M. WOOD • Clerk of the Court
FILED:    AA